1

Priority ✓
Send ✓
Enter ———
Closed ———
JS-5/JS-6 ———
JS-2/JS-3 ———
Scan Only———

FILED
CLERK, U.S. DISTRICT COURT

AUG 2 1 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

8

9

10

11  RONDOR MUSIC INTERNATIONAL INC., )   CASE NO. CV 05-2909-JTL
     and MICHAEL TYRONE JOHNSON p/k/a )
12  STERLING,                        )
                                     )   FINAL   RULING  RE  MOTIONS   IN
13          Plaintiffs,              )   LIMINE
        v.                           )
14                                   )
     TVT RECORDS LLC and DOES 1-10,  )
15  inclusive,                       )
                                     )
16          Defendants.              )
                                     )
17  _____ )



DOCKETED ON CM

AUG 2 1 2006

BY                051

18

19                    **DEFENDANTS' MOTIONS IN LIMINE**

20  1.    **DEFENDANTS' MOTION IN LIMINE TO EXCLUDE TESSIE JOHNSON AND LONNIE**

21        **FERGUSON AS WITNESSES AT TRIAL**

22        Defendants   seek   to   preclude   plaintiffs   from   calling   two

23  witnesses, Tessie Johnson and Lonnie Ferguson, as trial witnesses,

24  based on a purported agreement between the parties that if defendants

25  agreed not to depose Johnson and Ferguson, plaintiffs would not call

26  them as witnesses at trial. On March 15, 2006, counsel for defendants

27  confirmed in a letter to plaintiffs' counsel that they would not

28  proceed with the depositions of Ferguson or Johnson if plaintiffs

235

agreed not to call either witness at trial.  In addition, the parties allegedly agreed that defendants would not comment on the non-appearance at trial of either witness, or the Court could issue a limiting instruction and/or plaintiffs would be able to call the same witnesses at trial.  (Barnes Decl., Exh. B).

On March 22, 2006, defendants sent an e-mail to plaintiffs with a proposed stipulation regarding the witnesses' depositions attached to the e-mail.  In that attachment, defendants proposed terms that were different from the terms set forth in the March 15, 2006 letter.  Defendants had modified the agreement so that, in addition to agreeing that they would not call the witnesses at trial, plaintiffs would have to agree that they would not refer to the witnesses during trial.  The proposed stipulation also narrowed the remedies available in the event defendants commented on the non-appearance of the witnesses.

In a subsequent letter to plaintiffs dated March 23, 2006, counsel for defendants confirmed the agreement as to Ferguson and Johnson "set forth in [his] letter [] of March 15, 2006," suggested that the parties enter into the same agreement with respect to a third witness, Greg Street, and sent a Stipulation to plaintiffs' counsel consistent with the agreement.

On March 24, 2006, however, plaintiffs' counsel responded in a letter by stating, among other things, the following:   "I was disappointed to receive your draft stipulation with respect to the depositions of Lonnie Ferguson and Tessie Johnson, which was not what we proposed and which also included another witness, Greg Street.  I am sorry that we ultimately could not reach an agreement on these issues, and we are no longer prepared to limit our right to call any rebuttal witness at trial that we see fit."  (Barnes Decl., Exh. D).

2

On March 28, 2006, defense counsel sent his reply, stating, in part: "With respect at least to Mr. Ferguson and Ms. Johnson, our agreement as set forth in my letter to you of March 15, 2006 stands, and we will honor and enforce it at trial." (Barnes Decl., Exh. E).

Defendants claim that they released the two witnesses from their subpoenas and did not go forward with their depositions based on their reliance on the agreement into which plaintiffs and defendants had entered. Both witnesses' depositions were originally noticed for March 28, 2006. Plaintiffs dispute the fact that they had entered into an agreement with defendants concerning the depositions of Ferguson and Johnson. The terms proposed by defendants as stated in the March 15, 2006 letter and the terms set forth in the proposed stipulation that defendants attached to their March 22 e-mail differed. Although plaintiffs' March 24 letter stated that plaintiffs were rejecting the stipulation, they also made clear their position that the parties had been unable to reach an agreement on the issue generally. Plaintiffs confirmed this in their March 29 letter. (Barnes Decl., Exh. E).

It was clear that plaintiffs' position was that there was no agreement as to Ferguson's and Johnson's depositions. Defendants never made an attempt to re-notice the depositions of Ferguson and Johnson, and do not contend that they were unable to take the depositions as a result of plaintiffs' conduct. Defendants did not file a discovery motion to address the issue.

Finally, plaintiffs do not intend to call these witnesses in their case-in-chief, and may only call them as rebuttal witnesses if they deem it necessary.

///

3

1  For these reasons, defendants' motion in limine to preclude the

2  testimony of Lonnie Ferguson and Tessie Johnson is DENIED.

3

4  2.   DEFENDANTS' MOTION IN LIMINE TO PRECLUDE ANGELA THOMAS FROM

5       PROVIDING OPINION TESTIMONY

6       Defendants assert in this motion that certain portions of the

7  rebuttal report from plaintiffs' expert, Angela Thomas, should be

8  precluded on the ground that she is not qualified to provide an

9  opinion on (1) the specific proportion of plaintiff Sterling's

10 composition that is copied in the "Crunk Juice" ("CJ") version of

11 "Lovers and Friends" and (2) the specific proportion of CJ album sales

12 attributable to the radio airplay of "Lovers and Friends." Defendants

13 also contend that her opinions are unreliable, speculative, and lack

14 foundation.

15      In addition to assisting the trier of fact to understand the

16 evidence or to determine a fact in issue, Federal Rules of Evidence

17 Rule 702 requires that expert testimony be relevant and reliable.

18 United States v. Vallejo, 237 F.3d 1008, 1019 (9th Cir.), amended by

19 246 F.3d 1150 (9th Cir. 2001); see Daubert v. Merrell Dow Pharms.,

20 Inc., 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  To

21 be admissible, expert testimony must (1) address an issue beyond the

22 common knowledge of the average layman, (2) be presented by a witness

23 having sufficient expertise, and (3) assert a reasonable opinion given

24 the state of the pertinent art or scientific knowledge.  United States

25 v. Morales, 108 F.3d 1031, 1038 (9th Cir. 1997).  In Daubert, the

26 Supreme Court held that faced with a proffer of expert scientific

27 testimony, the trial judge must determine at the outset whether the

28 expert is proposing to testify to (1) scientific knowledge that (2)

4

will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. <u>Daubert</u>, 509 U.S. at 592-93.[1]  This basic gatekeeping obligation is not limited to scientific testimony but applies to all expert testimony. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).  Moreover, the district court is accorded broad latitude in determining the reliability of expert testimony. <u>Id.</u> at 142; <u>United States v. Hankey</u>, 203 F.3d 1160, 1167 (9th Cir. 2000).

Here, defendants challenge the reliability of Angela Thomas's rebuttal opinion to the extent she assigns specific percentages to (1) the proportion of plaintiff Sterling's composition that was copied in the CJ version of "Lovers and Friends" and (2) the proportion of CJ album sales attributable to the radio airplay of "Lovers and Friends." (<u>See</u> Barnes Decl., Exh. B at 26, 28).

Having reviewed the pleadings, exhibits, and declarations in support of and in opposition to defendants' motion in limine, including Ms. Thomas's deposition testimony, the Court finds that the reasoning and methodology upon which Ms. Thomas appears to base her conclusions in her rebuttal report are not reliable.

---

[1] In <u>Daubert</u>, the Supreme Court identified four factors that a district court should consider in making its preliminary assessment: (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high "known or potential rate of error;" and (4) whether there are standards controlling the technique's operation.  <u>Kumho Tire</u>, 526 U.S. at 149-50.

First, during her deposition, Ms. Thomas was unable to articulate a specific process or methodology by which she reached her conclusions. For example, counsel asked Ms. Thomas about her conclusion that ninety percent of the CJ version of "Lovers and Friends" was attributable to plaintiff Sterling's original version of "Lovers and Friends":

> Q: What's the basis for your opinion that it's 90 percent? How did you get to that percentage? I understand you think they're very similar. But why that particular number?
>
> A: I - in my mind it's 90 to 100 percent. It's very much the same. So I just put down 90 percent, because there are some minor differences.
>
> Q: So the reason that you didn't pick 100 percent is you found there were minor differences?
>
> A: Correct.
>
> Q: Why did you quantify those differences at 10 percent?
>
> A: I just left some breathing room.
>
> Q: Could it have been 95 percent?
>
> A: It very well could have been 95 or 100 percent, in my opinion.
>
> . . .
>
> Q: Do you have any statistical basis for quantifying the number at 90 rather than any other number?
>
> A: No, I don't.

(Barnes Decl., Exh. C at 44). Ms. Thomas also concluded that sixty percent of the sales of the CJ album was due to radio airplay of

1 "Lovers & Friends."  (See Barnes Decl., Exh. B at 26).

2    Daubert makes clear that the four factors it discusses do not

3 constitute a definitive checklist or test.  Kumho Tire, 526 U.S. at

4 150.   These factors may or may not be pertinent in assessing

5 reliability depending on the nature of the issue, the expert's

6 particular expertise, and the subject of his testimony.  Id.  In this

7 case, Ms. Thomas, in an attempt to rebut defendants' experts' opinions,

8 rendered an opinion in which she assigned specific percentages to her

9 conclusions.  By characterizing her findings in this manner, however,

10 Ms. Thomas invited inquiry into the precise method that she used to

11 come to her conclusions.   In response to questions regarding her

12 conclusion that sixty percent of the sales of the CJ album was

13 attributable to "Lover and Friends," Ms. Thomas stated the following:

14          Q:   When you say 60 percent is attributable to

15          Lovers and Friends, do you mean 60 percent is

16          attributable to Lovers and Friends' airplay?

17          A:   I meant 60 percent of the sales of the album

18          Crunk Juice is attributed to the airplay of Lovers

19          and Friends.

20          Q:   When did you reach that opinion, that 60

21          percent opinion?

22          A:   When I looked at Mediabase and viewed it from

23          the inception still - to 265,000 spins.  And I

24          reviewed the audience, and I compared it to What

25          U Gon Do and the other two singles.  I just knew

26          it was an outstanding single, a phenomenon.

27          Q:  Did you reach the 60 percent conclusion before

28          or after you signed your original report on April

7

1       the 17th?

2       A:  In my head on the original report, I knew that

3       Lovers and Friends was a significant amount - the

4       reason why the album sold, and I knew it was a

5       significant amount.  But I based a number on after

6       reading the two rebuttal reports that were given

7       to me.

8       Q:  So as of April 17th, you had not come to a

9       conclusion with a particular number?

10      A:  No, I did not.

11          . . .

12      A.  I looked at Mediabase and SoundScan when I did

13      my initial report.  It was after I reviewed the

14      rebuttals, and I thought I should just respond in

15      a number where they had a number in their reports.

16          . . .

17  (Barnes Decl., Exh. C at 58).  Ms. Thomas also testified that she took

18  "star power" and "past success" into consideration, "What U Gon Do,"

19  and "overall marketing."  She testified that in her mind she felt like

20  "it's definitely no less than 60 percent because the song similarity

21  is - in [her] mind it's a rendition."  (Id.).  Later in her deposition,

22  when Ms. Thomas was specifically asked what the process was that she

23  used in reaching the 60 percent number, Ms. Thomas testified to the

24  same factors as above:  star power, past success, marketing, "What U

25  Gon Do," and "Lovers and Friends."  (Id. at 59).  She also testified

26  that she did not have a statistical basis for the 60 percent but that

27  she knew the album had extraordinarily significant airplay in a huge

28  market throughout the country.  Ms. Thomas noted that the song streamed

1  over AOL to 495,000 consumers in a given week.  (See Barnes Decl., Exh.

2  C at 59).   She conceded that her conclusions were not based on any

3  mathematical conclusions.  (Id. at 60).

4      The objective of the "gatekeeping" requirement as set forth in

5  Daubert is to make certain that an expert, whether basing testimony

6  upon professional studies or personal experience, employs in the

7  courtroom the same level of intellectual rigor that characterizes the

8  practice of an expert in the relevant field.  Kumho Tire, 526 U.S. at

9  152.   In this instance, it is difficult to ascertain the methodology

10  or process Ms. Thomas utilized to reach her conclusions involving

11  percentages.

12      Although defendants argue that Ms. Thomas is not a musicologist,

13  which has been defined as someone who is engaged in academic research

14  in the scholarly study of music,[2] the Court is not persuaded that one

15  needs to be a musicologist in order to render a reliable opinion.  The

16  focus of Ms. Thomas's experience in the music industry has been

17  marketing and promotion.  (See Barnes Decl., Exh. A at 3) ("I have

18  worked in the music industry for more than twenty years.  My focus has

19  been in marketing and promotion . . . ").   She promoted records to

20  radio stations, clubs, record pools, and colleges; worked as a product

21  manager; was an officer of a marketing company; and implemented

22  marketing campaigns.  (See Barnes Decl., Exh. A at 4-5).   A few years

23  ago, Ms. Thomas started her own boutique entertainment marketing firm.

24  She has testified in only one other case.  (Id. at 6).

25      On the other hand, plaintiffs argue that an expert need not be an

26  academic with "scientific or technical" education because industry and

27  ────────────

28      [2]  http://www.oed.com/ (search "Find Word" for "musicologist");
    see also http://www.oed.com/ (search "Find Word" for "musicology").

9

work experience are equally sufficient.  At the hearing on this matter on August 15, 2006, plaintiffs argued that the fact that Ms. Thomas' conclusions are not based on a mathematical or statistical analysis does not render her opinion unreliable.  Plaintiffs also offered to file a supplemental report or subject Ms. Thomas to what is essentially a Daubert hearing.

It is well within the Court's "discretion to choose among *reasonable* means of excluding expertise that is *fausse* and science that is junky." Kuhmo Tire, 526 U.S. at 159.  Based on the foregoing, and the current record, the Court finds the portion of Ms. Thomas's rebuttal opinion in which she concludes that 90 percent of the CJ version of "Lovers and Friends" was attributable to plaintiff Sterling's composition and that 60 percent of CJ sales was attributable to "Lovers and Friends" is not based on a reliable method.  Thus, defendants' motion in limine is GRANTED as to that limited portion of Ms. Thomas's testimony.  This Order is without prejudice to plaintiffs renewing their request during trial to admit the testimony at issue subject to a Daubert hearing.

### PLAINTIFFS' MOTIONS IN LIMINE

1. **PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE TESTIMONY OF BELATEDLY DESIGNATED EXPERT WITNESS PAUL HUTCHINSON AND RELIANCE ON BELATEDLY PRODUCED DOCUMENTS AND EXPERT REPORTS**

Plaintiffs seek an order from the Court precluding (1) Paul Hutchinson, TVT's expert accounting witness, from testifying; (2) TVT from relying on belatedly produced documents in support of its expert's opinion; and (3) TVT from relying on any new expert reports.  Among other things, plaintiffs contend that TVT did not timely designate

10

1  Hutchinson by the Court-ordered deadline; TVT forced plaintiffs to
2  prepare for and take depositions of two experts on the same issue; TVT
3  failed to seek relief from the Court to designate Hutchinson as an
4  expert instead of Keith Bernstein, who TVT had originally designated;
5  and TVT has made a piecemeal production of key financial documents.

6    Defendant TVT, on the other hand, argues that it properly
7  designated Hutchinson's expert report on April 17, and any subsequent
8  reports that were prepared and turned over were pursuant to Federal
9  Rule of Civil Procedure 26(e)(1) and TVT's obligation to supplement
10 information.  Moreover, TVT contends that it was a victim of the
11 actions of their first expert, Keith Bernstein, who notified TVT in an
12 e-mail on April 20 that he did not want to testify as an expert for TVT
13 in this case.  Bernstein also stated that he had made an error in his
14 calculations, and was not confident that he could accurately describe
15 the methodology that Hutchinson had used.  In sum, Bernstein told TVT
16 that he thought Hutchinson was "better suited to be the expert for TVT
17 based on how the report evolved and because he ultimately authored the
18 report."  (Barnes Decl., Exh. A).

19   Rule 26(a)(2)(C) provides that, to the extent a party supplements
20 expert disclosures, such action shall be consistent with the
21 requirements of Rule 26(e)(1).  Rule 26(e)(1)(a) imposes upon a party
22 a duty to supplement "if the party learns that in some material respect
23 the information disclosed is incomplete or incorrect and if the
24 additional or corrective information has not otherwise been made known
25 to the other parties . . . With respect to the testimony of an expert
26 from whom a report is required under subdivision (a)(2)(B) the duty
27 extends both to information contained in the report and to information
28 provided through a deposition of the expert, and any additions or other

1 changes to this information shall be disclosed by the time the party's

2 disclosures under Rule 26(a)(3) are due." Rule 26(a)(3) provides for

3 pretrial disclosures on a certain date or at the Court's discretion.

4      TVT provided a revised version of Hutchinson's report on May 30,

5 2006, which responded to plaintiffs' expert's criticisms of

6 Hutchinson's work. This was the third report that TVT provided. TVT

7 claims that the revised report was based, in part, on updated

8 information through April 30, 2006. TVT then made Hutchinson available

9 for a deposition. Plaintiffs argue that the report was based on an

10 entirely different methodology for allocating certain expenses and

11 included new accounts and deductions.

12      Certainly, the appropriate course would have been for TVT to seek

13 relief from the Court to designate Hutchinson as the expert to replace

14 Bernstein and to seek an order allowing the late production of a

15 revised report and supporting documents. It appears, however, that

16 some events for which TVT was not responsible contributed to TVT's

17 untimely actions. Plaintiffs were aware of Hutchinson's opinion based

18 on the disclosure of the initial report on April 17, 2006. Plaintiffs

19 were then notified of the change in experts on April 24, 2006.

20      Plaintiffs also had an opportunity thereafter to take Hutchinson's

21 deposition on May 5, 2006. The supplemental reports that TVT

22 subsequently produced were consistent with its obligations under Rule

23 26(e)(1) and the late production of documents was based upon the

24 revised report. Nevertheless, given the substantial changes that Mr.

25 Hutchison has made in his most recent report, plaintiffs have been

26 prejudiced by the late disclosures. On July 25, 2006, plaintiffs

27 submitted a Supplemental Memorandum in support of their motion in

28 limine. Plaintiffs stated therein that since the filing of the

1 motions, TVT has produced still more untimely documents, consisting of

2 several hundred pages of previously unproduced invoices that TVT paid

3 in connection with the marketing of "Lovers and Friends." These

4 documents purportedly were additional documents that Hutchinson wanted

5 to sample.

6     In light of the foregoing, the Court will allow plaintiffs to

7 conduct a further deposition of Mr. Hutchinson prior to the

8 commencement of trial. The deposition shall occur as soon as

9 reasonably possible but shall not exceed seven hours. Defendants shall

10 pay for any expedited transcripts and reasonable attorney's fees, which

11 shall include Mr. Frackman's attorney's fees for attendance at the

12 deposition.[3] Defendants shall also produce any additional workpapers

13 of Mr. Hutchison that have not already been produced at least forty-

14 eight hours before the deposition is scheduled to occur. And plaintiffs

15 shall be granted leave to prepare any demonstrative exhibits in

16 response to the testimony obtained during the deposition.

17     Plaintiffs also contend that TVT served an "erratum" to the

18 reports of Lawrence Ferrara, one of TVT's experts, which significantly

19 changes Ferrara's opinion about the portion of TVT's infringing song

20 that is attributable to plaintiffs' song. (See Supplemental Memo, Exh.

21 2). TVT argues that plaintiffs had notice of Dr. Ferrara's change

22 based on a mathematical error and, in fact, questioned Dr. Ferrara

23 about it as his deposition. Because the change slightly alters Dr.

24 Ferrara's conclusion, plaintiffs should have an opportunity to question

25 Dr. Ferrara about the change. Accordingly, TVT shall make Dr. Ferrara

26 available for his deposition to address this change as soon as

27 _____

28     [3] Plaintiffs shall submit a separate request for any attorneys'
fees involving the preparation for the deposition.

1  reasonably possible.  The length of Dr. Ferrara's deposition shall not
2  exceed three hours.

3

4  2.  **PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF MUSIC INDUSTRY**

5  **CUSTOM AND PRACTICE AND TESTIMONY OF EXPERT WITNESS ROBERT SHAW**

6         Here, plaintiffs argue that TVT should be precluded from

7  introducing evidence that it is common in the music industry for

8  licenses to be obtained after the release of the work containing the

9  unlicensed material.  Plaintiffs contend that such evidence is both

10  undisputed and irrelevant to the legal issues.  Even if the evidence

11  is relevant, plaintiffs argue that the probative value of such evidence

12  is substantially outweighed by unfair prejudice, and would lead to

13  confusion of the issues, or misleading the jury.  Fed. R. Evid. 403.

14         In response, TVT contends that such evidence is relevant to TVT's

15  affirmative defense of consent and to the question of willful

16  infringement.[4]  Furthermore, TVT states that it only intends to call

17  four "custom and practice" witnesses: (1) expert Robert Shaw; (2) Rand

18  Hoffman, in charge of business affairs at Interscope, who will testify

19  to general Universal clearance practices at the corporate level; and

20  (3) Leo Ferrante and Deonna Perry, current employees in the

21  administrative division of Universal Music Group, who will testify to

22  the day to day custom and practice of music clearances.

23         Although the Court had tentatively found that evidence of "custom

24  and practice" is relevant to the issue of willful infringement, at the

25

26         [4] In its Order ruling on plaintiffs' Motions for Summary
   Judgment, the Court found that defendant TVT had not offered
27  sufficient legal support for its affirmative defense of consent.
   Therefore, this Court considers only whether the "custom and
28  practice" evidence is relevant to the issue of TVT's willful
   infringement.

1   hearing of this matter on August 15, 2006, plaintiffs stated that they

2   would no longer assert that defendants willfully infringed plaintiff

3   Sterling's copyright.   Thus, any evidence that defendants seeks to

4   admit that is arguably relevant to the issue of willfulness is no

5   longer at issue.

6       Evidence that post-release clearance is customary in the industry,

7   however, may also be relevant to generally explain defendants' actions

8   in this case.   Notwithstanding this, the Court GRANTS plaintiffs'

9   motion in limine based on plaintiffs' representation at the hearing

10  that they will not assert that defendants engaged in willful

11  infringement.   If, however, plaintiffs directly or indirectly imply

12  during trial that defendants' efforts to obtain post-release clearance

13  were unusual, wrong, or not consistent with custom and practice in the

14  industry, plaintiffs will have "opened the door" and defendants will

15  then have an opportunity to introduce in a limited manner evidence to

16  rebut the implication.

17

18  3.   **PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE TESTIMONY OF ROBERT KOHN**

19      Plaintiffs seeks to exclude the testimony of Robert Kohn, one of

20  TVT's designated experts.   It appears that TVT intended to offer Kohn's

21  testimony to support its counterclaims for breach of oral contract and

22  license, and its affirmative defense of consent.   Because the Court

23  granted plaintiffs' motions for summary judgment as to these claims and

24  defense, plaintiffs' motion in limine is DENIED as moot to the extent

25  defendants seek to introduce Kohn's testimony to support theories based

26  upon breach of oral contract and consent.

27  ///

28  ///

4.   **PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE TVT FROM CALLING
WITNESSES NOT PREVIOUSLY DISCLOSED TO PLAINTIFFS**

Of the ten witnesses that plaintiffs seeks to preclude defendant TVT from calling, TVT contends it intends to call only two witnesses: Leo Ferrante and Deonna Perry, employees of Universal Music Group. Because the Court has already ruled on the admissibility of their testimony in connection with plaintiffs' Motion in Limine No. 2, plaintiffs' motion is DENIED as moot.

5.   **PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE EVIDENCE AND ARGUMENT
REGARDING PRIOR TESTIMONY OF MICHAEL WALLACE**

In 2002, Michael Wallace, plaintiffs' expert witness, testified on behalf of plaintiffs' counsel's law firm, Mitchell Silberberg & Knupp LLP ("MSK"), in a legal malpractice case in which the law firm was the defendant.   The malpractice case was based on a claim of negligent failure to perfect a security interest in a motion picture. Mr. Wallace was retained by Munger, Tolles & Olson, the law firm representing MSK.   MSK ultimately prevailed.

Plaintiffs now seek to preclude TVT from questioning Wallace about his testimony in that case, <u>Alliance Atlantis Pictures International, Inc. v. Mitchell Silberberg & Knupp LLP</u>, Case No. BC 275846, on the grounds that such testimony is irrelevant and would likely lead to confusion of the issues, be prejudicial, and cause a significant waste of time.

There is no dispute that the legal malpractice case is unrelated to any of the matters at issue in this case.   Defendant TVT contends, however, that the jury is entitled to know that Wallace once worked personally for plaintiffs' law firm and that such information is

1  directly relevant to Wallace's potential bias.

2      But the mere fact that another law firm retained Wallace at one

3  time to testify on MSK's behalf in an entirely unrelated case is not

4  relevant.  See Fed. R. Evid. 401.  To the extent such evidence is

5  tangentially related to Wallace's credibility, the probative value of

6  such evidence is outweighed by the danger of unfair prejudice,

7  confusion of the issues, and waste of time. As TVT itself notes,

8  Wallace has testified in many cases as an expert.  Therefore, TVT has

9  ample sources from which it can challenge Wallace's credibility.

10      Accordingly, plaintiffs' motion in limine is GRANTED.

11

12  6.  **PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE DEDUCTION OF LOSSES BY**

13      **NON-PARTIES TO ACTION**

14      Plaintiffs seek to preclude TVT from presenting evidence and

15  relying upon deductible expenses incurred by non-parties to this

16  action, specifically, TVT's affiliated entities in foreign countries.

17  The Copyright Act does not apply extraterritorially.  See Subafilms,

18  Ltd. v. MGM-Pathe Communications Co., 24 F.3d 1088, 1094 (9th Cir.

19  1994) (en banc).  For the Act to apply, "at least one alleged

20  infringement must be completed entirely within the United States."

21  Allarcom Pay Television Ltd. v. General Instrument Corp., 69 F.3d 381,

22  387 (9th Cir.1995).  But a party becomes liable for extraterritorial

23  damages when an act of infringement occurs within the United States,

24  subjecting it to liability as an infringer (or contributory infringer)

25  under the Copyright Act.    Los Angeles News Service v. Reuters

26  Television Intern., Ltd., 149 F.3d 987, 992 (9th Cir. 1998), cert.

27  denied, 525 U.S. 1141 (1999).

28  ///

1        In addition to actual damages, a copyright owner electing to seek

2   damages under Section 504(b) is entitled to recover "any profits of the

3   infringer that are attributable to the infringement and are not taken

4   into account in computing the actual damages."   17 U.S.C. § 504(b).

5   The statute provides further:  "[i]n establishing the infringer's

6   profits, the copyright owner is required to present proof only of the

7   infringer's gross revenues, and the infringer is required to prove his

8   or her deductible expenses and the elements of profit attributable to

9   factors other than the copyrighted work."   Id.; see also Barrera v.

10  Brooklyn Music, Ltd., 346 F. Supp. 2d 400, 411 (S.D.N.Y. 2004).

11       Although the Court in Reuters did not directly address the issue

12  of deductible expenses by a foreign entity, plaintiffs argue that

13  because the Copyright Act does not apply extraterritorially, defendants

14  may not deduct expenses incurred by defendants' foreign subsidiaries

15  or affiliates.  See 17 U.S.C. § 504(b).  Plaintiffs seek only revenues

16  earned by the defendants in this case, and not by their foreign

17  affiliates.  But plaintiffs also argue that, to the extent the foreign

18  affiliates remitted any money to the defendants, such revenue would be

19  included in the calculation of gross revenues to defendants.

20       In the case of indirect profits, i.e., revenue that has a more

21  attenuated nexus to the infringement, Section 504(b) creates a two-step

22  framework for recovery of indirect profits:  (1) the copyright claimant

23  must first show a causal nexus between the infringement and the gross

24  revenue; and (2) once the causal nexus is shown, the infringer bears

25  the burden of apportioning the profits that were not the result of

26  infringement.  Polar Bear Productions, Inc. v. Timex Corp., 384 F.3d

27  700, 711 (9th Cir. 2004).  For purposes of Section 504(b), "gross

28  revenues" includes only "gross revenues reasonably related to the

1 infringement, not unrelated revenues." See <u>On Davis v. The Gap, Inc.</u>,

2 246 F.3d 152, 160 (2d Cir. 2001).

3     Defendants have the burden of proving that their deductible

4 expenses relate to the infringement. Moreover, Section 504(b) clearly

5 states that the "infringer" must prove his or her deductible expenses.

6 17 U.S.C. § 504(b). In this case, the alleged infringers are the named

7 defendants. Monies received from foreign affiliates in the form of

8 licensing fees or other revenue are presumably monies that are paid to

9 defendants after the foreign affiliates accounted for and deducted

10 expenses. Thus, unless defendants were required to deduct these

11 additional expenses, defendants should not receive the benefit of a

12 deduction for which the foreign affiliates already accounted.

13 Additionally, the mere fact that TVT's foreign affiliates or

14 subsidiaries sustained losses from sales of the CJ album and the song

15 "Lovers and Friends," does not suggest that the same losses or expenses

16 are necessarily incurred by defendants. Thus, unless TVT can establish

17 that defendants would have had to deduct the expenses at issue,

18 plaintiffs' motion in limine is GRANTED.

19

20 **7.**     **<u>PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF PRIOR IDJ</u>**

21        **<u>LAWSUIT BETWEEN TVT AND ISLAND DEF JAM MUSIC GROUP</u>**

22     Plaintiffs bring this motion to preclude TVT from introducing

23 evidence or argument at trial concerning a prior, unrelated case, <u>TVT</u>

24 <u>Records v. The Island Def Jam Music Group</u>, 412 F.3d 82 (2d Cir. 2005).

25 The parties to that case included TVT Records and TVT Music, Inc. The

26 case concerned a dispute between TVT and Island Def Jam Music Group

27 ("IDJ") regarding a series of recordings by recording artist Ja Rule.

28 TVT sued IDJ for breach of contract, tort, and copyright claims.

1  Ultimately, after a jury verdict in favor of TVT, the judgment for TVT

2  was reduced on the breach of contract claim to $126,720.  Plaintiffs

3  object to the introduction of this evidence on the grounds that there

4  is nothing relevant to the case at hand, and even if something was

5  relevant, its probative value is substantially outweighed by the danger

6  of unfair prejudice, confusion of the issues or misleading the jury,

7  or by consideration of undue delay, waste of time, or needless

8  presentation of cumulative evidence pursuant to Fed. R. Evid. 403.

9      Defendant TVT argues that such information is directly relevant

10  to TVT's affirmative defenses of estoppel and consent.  In particular,

11  TVT argues that the lawsuit goes directly to TVT's state of mind with

12  respect to its responses to various "legal" letters.  TVT argues that

13  had it not been for his prior experience with Harvey Geller in the

14  previous lawsuit, Mr. Gottlieb would have reacted differently upon

15  receipt of plaintiffs' December 22 letter to TVT asserting that the

16  song "Lovers and Friends" was unauthorized.

17      At the hearing of this matter, defendants proffered the relevant

18  portion of Mr. Gottlieb's testimony, which would generally consist of

19  testimony concerning his frustration in dealing with plaintiffs' legal

20  department.  Given the proffer, the Court finds that reference to the

21  lawsuit itself is unnecessary and would potentially result in unfair

22  prejudice to plaintiffs or confusion of the issues.  Because the Court

23  finds that Mr. Gottlieb is able to convey the substance of his

24  testimony without reference to the specific lawsuit, plaintiffs' motion

25  in limine is GRANTED.

26  ///

27  ///

28  ///

8.   **PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF SETTLEMENT NEGOTIATIONS**

Plaintiffs bring this motion in limine pursuant to Federal Rules of Evidence 402, 403, and 408, in which they seek to preclude TVT from introducing evidence of any negotiations or discussions between the parties during the period from December 2004 through April 2005. Plaintiffs argue that evidence of all discussions between the parties should be precluded as irrelevant, prejudicial, and violative of the policy underlying Rule 408.

TVT responds that plaintiffs seek to preclude evidence of business negotiations that were held prior to the filing of this lawsuit and that the content of the discussions is essential to TVT's defense of estoppel.  Furthermore, TVT argues that the deal memos, emails, and other communications were clearly business discussions and were never referred to as being privileged or settlement discussions under Rule 408.

Rule 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.  This rule does not require the exclusion of any evidence otherwise discoverable

1          merely because it is presented in the course of

2          compromise negotiations.  This rule also does not

3          require exclusion when the evidence is offered for

4          another purpose, such as proving bias or prejudice

5          of a witness, negativing a contention of undue

6          delay, or proving an effort to obstruct a criminal

7          investigation or prosecution.

8    Fed. R. Evid. 408.

9        In order for initial communications to be inadmissible under Rule

10   408, the communications must reference valuable consideration and a

11   disputed claim must already exist.  See Fed. R. Evid. 408.  A litigant

12   asserting the applicability of Rule 408 must make a "substantial

13   showing" that the communications were part of the attempts to settle

14   the dispute.  United States v. Mirama Enterprises, Inc., 185 F. Supp.

15   2d 1148, 1156 (S.D. Cal. 2002).  For a dispute to exist, each party

16   must have formed differing opinions on the subject matter.  See Cassino

17   v. Reichhold Chem., Inc., 817 F.2d 1338, 1342 (9th Cir. 1987) (Rule 408

18   should not be used to bar relevant evidence simply because one party

19   calls its communication with the other party a settlement offer).  As

20   Rule 408 provides, in addition to the actual settlement offer, other

21   conduct or statements made in the course of compromise negotiations are

22   not admissible.  Thus, courts have found that internal memoranda or

23   reports that were intended to be part of negotiations toward compromise

24   may be excluded.  See Ramada Development Co. v. Rauch, 644 F.2d 1097,

25   1106-07 (5th Cir. 1981) (exclusion of report prepared for settlement

26   discussions); Blu-J, Inc. v. Kemper C.P.A. Group, 916 F.2d 637, 642

27   (11th Cir. 1990) (accountant's report and deposition prepared by mutual

28   agreement of parties as part of settlement negotiations).

1 Additionally, both letters and oral statements between counsel that are

2 part of compromise negotiations may be excluded under Rule 408. See,

3 e.g., Fare Deals Ltd. v. World Choice Travel.Com, Inc. 180 F. Supp. 2d

4 678, 695-96 (D. Md. 2001) (defense lawyer's letter to patent lawyer

5 responding to litigation threat is settlement offer within meaning Rule

6 408); Matosantos Commercial Corp. v. SCA Tissue North America, LLC, 369

7 F. Supp. 2d 191, 198-200 (D. Puerto Rico 2005) (letters exchanged

8 between counsel discussing terms of a distribution agreement were

9 exchanged in the course of negotiations between the parties that could

10 have avoided the litigation, and were not the product of business

11 communications).

12    Rule 408 primarily bars settlement offers as proof of the

13 offeror's liability.  Such offers may be admissible in the court's

14 discretion if relevant to prove something other than the offeror's

15 liability.  See Brocklesby v. United States, 767 F.2d 1288, 1292-93

16 (9th Cir. 1985) (indemnity agreement admitted to show relationship

17 between parties and to attack credibility of defendants' witnesses);

18 Freidus v. First National Bank of Council Bluffs, 928 F.2d 793, 795 (8th

19 Cir. 1991) (to negate a "contention of undue delay"); Cochenour v.

20 Cameron Savings & Loan, F.A., 160 F.3d 11 87, 1190 (8th Cir. 1998)

21 (plaintiff's letter to employer in discrimination case containing

22 settlement demand and statement that plaintiff intended to retire early

23 was admissible to contradict testimony that plaintiff had had no plans

24 to retire); Starter Corp. v. Converse, Inc., 170 F.3d 286, 293-94 (2d

25 Cir. 1999) (evidence of settlement negotiations, including letters and

26 testimony, admitted to prove claims of contractual and equitable

27 estoppel).

28 ///

On December 17, 2004, TVT sent plaintiffs a Co-Publishing Agreement that purported to settle the copyright dispute for advances totaling over $350,000.00, plus royalties. (See Declaration of Nathan Meyer in Support of TVT's Opposition, Exh. E at 33-35). Thereafter, on December 22, 2004, Randall Rumage, Vice President of Business and Legal Affairs of Rondor, sent a letter to Steve Gottlieb, Chief Executive Officer of TVT, informing him that further use of TVT's version of "Lovers and Friends" would be construed as willful infringement of their copyright and demanding the immediate payment of an advance. (See Declaration of Nathan Meyer in Support of TVT's Opposition, Exh. F at 49-50). Plaintiffs filed their Complaint against defendants for copyright infringement on April 20, 2005. Plaintiffs argue that the discussions, communications, and negotiations between the parties that occurred between December 2004 and April 2005 constitute evidence of conduct or statements made in compromise negotiations and, thus, are not admissible. But plaintiffs do not identify the particular documents or communications that they seek to preclude that allegedly fall within the protective scope of Rule 408. Instead, plaintiffs seek a wholesale ruling precluding defendants from introducing any written or oral communications between the parties during the five month period. Absent a more specific proffer of the evidence in dispute, however, the Court cannot determine whether Rule 408 applies to each of the communications.[5]

_____

[5] If a compromise or offer to compromise is offered for a purpose other than to prove liability for, or invalidity of, the claim or its amount, and an objection is raised on such grounds, the burden is on the proffering party to make an offer of proof informing the court of the purpose for which the evidence is being offered. See Catullo v. Metzner, 834 F.2d 1075, 1079 (1st Cir. 1987).

1    Thus, plaintiffs have not met their burden in showing that a
2  settlement offer or offer to compromise in connection with an actual
3  dispute was made, that every discussion or communication that occurred
4  between the parties thereafter was made in relation to a settlement
5  offer or compromise, and that all the communications are offered to
6  prove the validity or invalidity of a disputed claim, for which there
7  is no other admissible purpose.

8    Plaintiffs  also  contend  that  such  evidence  is  irrelevant.
9  Defendants respond that evidence of the agreement they were negotiating
10 with  plaintiffs  regarding  the  splits  was  relevant  to  show  that
11 plaintiff Sterling did not object, and in fact consented, to defendant
12 TVT's  creation,  release,  and  continued  exploitation  of  "Lovers  and
13 Friends."   Furthermore,  the  evidence  shows  that  plaintiffs  did  not
14 request that defendant TVT stop distribution of the work.   Defendants
15 also  argue  that  the  negotiations  are  relevant  to  establish  non-
16 willfulness  of  any  infringement  and  estoppel.   Because  consent  and
17 willfulness are no longer issues for trial, defendants' claim that such
18 evidence is relevant to their estoppel defense is the only remaining
19 potentially valid claim.   But, as plaintiffs failed to do, defendants
20 have not proffered the particular evidence that they plan to introduce
21 in support of their estoppel defense.   Thus, although plaintiffs failed
22 to meet their burden sufficient to exclude the evidence under Rule 408,
23 defendants  have  not  sufficiently  articulated  how,  in  light  of  the
24 absence  of  willfulness  or  consent  as  an  issue  in  this  case,  the
25 evidence of discussions between the parties from December 2004 to April
26 2005 is relevant to their case.

27    Accordingly, plaintiffs' motion in limine is GRANTED, without
28 prejudice to defendants proffering to the Court at the appropriate time

1  during trial the specific evidence they plan to introduce and how the

2  evidence supports their affirmative defense.  If defendants choose to

3  make such a proffer, the proffer shall be made to the Court outside the

4  presence of the jury.

6  **9.    PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF THE SIZE,**

7  **WEALTH, OR FINANCIAL CONDITION OF PLAINTIFFS**

8       In this motion, plaintiffs seek to preclude TVT from introducing

9  evidence at trial of the size, wealth, or financial condition of

10 plaintiffs, including the fact that plaintiff Rondor and Universal

11 Music Group are part of a large, international group of companies.

12 Plaintiffs argue that such evidence is not relevant to any of the

13 issues in this case.

14      TVT argues that the relative size of the companies is relevant to

15 TVT's affirmative defense of consent.  Because the Court already ruled

16 in connection with the parties' motions for summary judgment that

17 defendants had not sufficiently articulated a defense based on consent,

18 the Court rejects this argument.  To the extent TVT seeks to refer

19 indirectly to the relative size and influence of plaintiff Rondor and

20 Universal Music Group in questioning the motives and credibility of

21 plaintiff Sterling, the Court will allow TVT to ask limited questions

22 on this subject during plaintiff Sterling's cross-examination.

23 Accordingly, plaintiffs' motion in limine is GRANTED in part and DENIED

24 in part.

25 ///

26 ///

27 ///

28 ///

26

10. **PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE EVIDENCE OF PRIVILEGED COMMUNICATIONS**

Plaintiffs bring this motion to preclude TVT from introducing evidence or argument at trial concerning privileged communications between plaintiffs and their legal counsel. In particular, plaintiffs are concerned about any reference to the redacted privileged portions of e-mails that were exchanged between Zachary Horowitz, Lance Freed, and Harvey Geller.

TVT, in response, does not dispute the premise that it would be inappropriate during trial for anyone to reference or ask the jury to draw a negative inference from the redacted portions of the e-mails. The parties disagree, however, as to whether the Court should instruct the jury as to the fact that there are redacted portions of the e-mails. Plaintiffs' motion is DENIED without prejudice to plaintiffs requesting the instruction at the appropriate time during trial.

IT IS SO ORDERED.

Dated:  August 21, 2006

JENNIFER T. LUM
UNITED STATES MAGISTRATE JUDGE